RECEIVED

FEB 2 2 2017

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF MINNESOTA, AND COMMONWEALTH OF MASSACHUSETTS, | Court File No. _1750-545 RHK/TNL_ |
| ex rel. | **FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| Ryan Mesaros (Relator), | **FILED UNDER SEAL AND _IN CAMERA_ PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Plaintiffs, | **DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER OR CM/ECF** |
| v. | |
| Target Corporation, a Minnesota corporation, | |
| Defendant. | |

Plaintiff and Relator Ryan Mesaros, through his attorneys, JOHN A. KLASSEN, P.A., 310 Fourth Avenue South, Suite 5010, Minneapolis, Minnesota 55415, and MULLER & MULLER, P.L.L.C., 3109 West 50th Street, Suite 362, Minneapolis, Minnesota 55410, states and alleges as follows:

### NATURE OF CLAIM

1.     Ryan Mesaros, Pharm.D. ("Relator") brings this action on behalf of the United States of America, the State of Minnesota and the Commonwealth of Massachusetts (hereinafter "the Plaintiff States"), against Defendant Target Corporation ("Defendant") for damages and civil penalties arising from Defendant's violations of the United States False Claims Act, 31 U.S.C. §§ 3729 to 3733, the United States Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), the United States Beneficiary Inducement Statute, 42 U.S.C. § 1320a-7a(a)5, the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 et seq., and the Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12 §§ 5A et seq., (hereinafter referred to jointly as the "False Claims Acts").

SCANNED
FEB 2 2 2017
U.S. DISTRICT COURT MPLS

2.      While transacting business in Minnesota and Massachusetts, Defendant has, in violation of the False Claims Acts, perpetrated fraud and false claims in connection with pharmacy transactions reimbursed by Medicare, Medicaid, TRICARE and other government funded health care programs.  In particular, and set forth in further detail below, Defendant fraudulently sought and received reimbursement from the United States and the Plaintiff States for the sales of pharmaceutical goods and services to persons covered by federally funded health care plans in violation of the Anti-Kickback Statute, the Beneficiary Inducement Statute and the False Claims Acts. Defendant did so in the following manners:

    a.      Defendant enrolled government healthcare program beneficiaries in its RxRewards program and gave remuneration to them even though such conduct was prohibited by the Anti-kickback Statute and the Beneficiary Inducement Statute, as well as the other False Claims Acts; and

    b.      Defendant induced its Minnesota customers to use its pharmacies and caused inflated sales of more expensive brand name drugs among Medicare Part D and other federal healthcare program beneficiaries in the State of Minnesota through the use of pharmaceutical company copay coupons, which Defendant willingly accepted and repeatedly provided to its Minnesota federal healthcare program beneficiary customers.

Each of the actions described above was explicitly prohibited by the False Claims Acts, the Anti-Kickback Statute and the Beneficiary Inducement Statute. Defendant's purpose in knowingly and willfully engaging in these actions was to offer or transfer "remuneration" to federal health care beneficiaries in order to influence the beneficiary's selection of a reimbursable product (such as a

prescription drug or good) or the selection of a provider of such a product, such as Defendant's retail pharmacies.

3.    Defendant has knowingly and willfully offered, paid, and solicited remuneration to its customers to induce or reward purchases of products (such as prescription drugs) reimbursable by a federal health care program (such as Medicare, Medicaid and TRICARE). 42 U.S.C. § 1320a-7b(b). "Remuneration is broadly defined to include anything of value." See, e.g. 67 Fed. Reg. 55855, 55856 (Aug. 30, 2002).

4.    Defendant undertook actions to implement, condone, and continue the submission of these false claims and fraud to the United States Government and the governments of the Plaintiff States.

5.    As required by the United States False Claims Act and the state False Claims Acts, Relator has provided to the Attorney General of the United States, the United States Attorney for the District of Minnesota ("AUSA-MN"), the OIG HHS, and the States Attorneys General statements of all material evidence and information related to this Complaint. These disclosure statements were supported by material evidence known to Relator at the time. Because these statements included attorney-client communications and work product of Relator's attorneys, and were submitted to the United States Attorney General, the AUSA-MN, the OIG HHS, and the States Attorneys General in their capacities as potential co-counsel in this litigation, Relator understood and intended these disclosures to be confidential.    These disclosures have been served on the Attorney General of the Commonwealth of Massachusetts with the Complaint, pursuant to that state's False Claims Act.

6.    Prior to filing this Complaint, on or about April 26, 2015, pursuant to the False Claims Acts, Relator voluntarily provided the AUSA-MN, the OIG HHS and the States

Attorneys General with documentary and testimonial evidence supporting the claims asserted herein against Defendant. This evidence included work product of Relator's attorneys, and it was submitted to the United States Attorney General, the AUSA-MN, the OIG HHS and the State Attorneys General in their capacities as potential co-counsel in this litigation. The Relator understood and intended these disclosures of evidence to be confidential.

## JURISDICTION AND VENUE

7.      This action arises under the United States False Claims Act, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), the Beneficiary Inducement Statute, 42 U.S.C. § 1320a-7a(a)5, the Minnesota False Claims Act and the Massachusetts False Claims Act. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b), 42 U.S.C. §§ 1320 et seq. and because Defendant resides, owns property, employs individuals, and transacted business in this District. This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. The Court has pendant jurisdiction over the state law claims.

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) 42 U.S.C. § 1320 et seq.; many of the unlawful acts complained of herein took place in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, Defendant resided, owned property, employed individuals, and transacted business in this District.

## PARTIES

9.      Relator is an adult male who at all times relevant was a resident of Minnesota and a citizen of the United States and of the State of Minnesota. At all times material, Relator was a licensed pharmacist and an "employee" of Defendant. Relator brings this action based on direct, independent, and personal knowledge, except where alleged upon information and belief. Relator

is an original source of this information to the United States and the Plaintiff States' Governments. He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided this information to the United States Attorney's Office, the OIG HHS and the State Attorneys General before filing this action under the False Claims Acts.

10.    Defendant is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota, and it was at all times material Relator's employer. Defendant employed him at its retail stores throughout Minnesota, where it provided retail pharmacy services to government healthcare program beneficiaries, including without limitation Medicare, Medicaid and TRICARE. Medicaid is a public assistance program providing for payment of medical expenses for low-income patients, including payment in whole or in part for pharmaceutical goods and services.  Funding for Medicaid is jointly shared by the state and federal governments, including the Plaintiff States.

## THE FALSE CLAIMS ACTS

11.    The United States False Claims Act provides, in pertinent part that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; ... or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

***

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....

For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729.

12.    Federal law specifically imposes limitations on so-called "rewards programs" offered by retail pharmacy operations.  The following statutes are implicated by Defendant's unlawful conduct in this case:

- Federal Anti-kickback Statute:  This statute makes it a criminal offense to knowingly and willfully offer, pay, solicit or receive any remuneration to, in relevant part, induce or reward purchases of products (such as prescription drugs) reimbursable by a federal health care program (such as Medicare, Medicaid and TRICARE).  42 U.S.C. § 1320a-7b(b).  "Remuneration" is broadly defined to include anything of value.  See, e.g. 67 Fed. Reg. 55,855, 55856 (Aug. 30, 2002); and

- Beneficiary Inducement Statute:  This closely related statute, which is also called the civil monetary penalty statute, provides for monetary penalties and exclusion from federal programs for any person who offers or transfers "remuneration" to a federal healthcare program beneficiary that is likely to influence the beneficiary's selection of a reimbursable product (such as a prescription drug or good) or the selection of a provider of such a product, such as a retail pharmacy.  42 U.S.C. § 1320a-7a(a)(5).

A violation of the Anti-kickback Statute and the Beneficiary Inducement Statute will implicate the False Claims Acts.

13.    Similarly, the Minnesota False Claims Act, provides, in pertinent part that:

(a) A person who commits any act described in clauses (1) to (7) is liable to the state or the political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per false or fraudulent claim, plus three times the amount of damages that the state or the political subdivision sustains because of the act of that person, except as otherwise provided in paragraph (b):  (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;  (2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7);  (7) knowingly makes or uses, or causes to be made or used, a false record or

statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision.

For purposes of this section of the Minnesota False Claims Act, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required, but in no case is a person who acts merely negligently, inadvertently, or mistakenly with respect to information deemed to have acted knowingly. Minn. Stat. §§ 15C.01 et seq.

14.     The Massachusetts False Claims Act, provides, in pertinent part that:

(a) Any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of this subsection; (9) knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision…..shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per violation…plus three times the amount of damages, including consequential damages, that the commonwealth or a political subdivision thereof sustains because of such violation. Mass. Gen. Laws Ch. 12 §§ 5B(a).

For purposes of this section of the Massachusetts False Claims Act, the terms "knowing" or "knowingly" mean possession of actual knowledge of relevant information, acting with deliberate ignorance of the truth or falsity of the information, or acting in reckless disregard of the truth or falsity of the information; provided, however, that no proof of specific intent to defraud shall be required. Mass. Gen. Laws Ch. 12 §§ 5A.

15.    Until December 2015, Defendant was an approved supplier and provider of pharmaceuticals, prescription drugs and other medical supplies to eligible beneficiaries of federally sponsored and funded healthcare programs, including Medicare, Medicaid and TRICARE. Medicare and TRICARE are solely funded by the federal government. Medicare is a health insurance program for the aged and disabled under Title XVIII of the Social Security Act. Part B of Medicare pays for a limited set of outpatient drugs and biologic products. Part C of Medicare, the Medicare Advantage ("MA") Program, provides for prescription drug coverage for eligible Medicare beneficiaries who select to join an MA plan that includes prescription drug coverage. Part D of Medicare pays for expanded outpatient prescription drug coverage to eligible beneficiaries through third-party insurance plans, otherwise known as Part D Plans ("PDPs"). TRICARE is an agency of the U.S. Department of Defense that administers and supervises the healthcare program for certain active duty and retired military personnel and their dependents and pays for prescription drugs supplied by pharmacies to eligible beneficiaries.

16.    Medicaid is medical assistance provided for certain low-income individuals under a state plan approved under Title XIX of the Social Security Act. State Medicaid, which is partially funded by the United States Government and partially funded by the individual state, pays for prescription drugs supplied by pharmacies to eligible beneficiaries. Participation in each state's Medicaid program is determined by regulations set by each state. Generally, each state assigns providers, including participating pharmacies, a unique identification number that is included on each electronic claim for reimbursement. Affixing this number to a claim certifies that, under each state's Medicaid regulations, as a Medicaid provider, the pharmacy is in compliance with all applicable state and federal regulations.

17.    The federal Anti-Kickback Statute prohibits any person or entity from knowingly and willfully offering to pay any remuneration, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to purchase, order, or arrange for ordering any good or item for which payment may be made in whole or in part under a federal healthcare program. 42 U.S.C. §1320a-7b(b). The related Beneficiary Inducements Statute prohibits "offers to or transfers [of] remuneration to any individual eligible for benefits under [federal healthcare programs] that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner or supplier any item or service for which payment may be made, in whole or in part, under [federal healthcare programs]." 42 U.S.C. §1320a-7a(a)(5).

18.    As a condition of enrollment as an approved supplier and provider of pharmaceuticals, prescription drugs and other medical supplies to eligible beneficiaries of the federally sponsored healthcare programs, Defendant certified that it understood and agreed that payment of a claim by federally sponsored healthcare programs was conditioned on the claim and the underlying transaction complying with the Federal Anti-Kickback Statute, among other laws, regulations and program instructions, including the Beneficiary Inducement Statute. (See e.g. CMS-855S, Section 15).    Additionally, and without limitation, Defendant's pharmacy agreements with various PDPs, MA plans and Pharmacy Benefit Management Plans ("PBMs"), wherein payment to Defendant was made under federally sponsored healthcare programs, were conditioned on Defendant's compliance with all applicable laws and regulations, including the federal Anti-Kickback Statute and the Beneficiary Inducement Statute. Further, any covered services provided by Defendant, including the sale of pharmaceuticals, prescription drugs and other medical supplies to eligible beneficiaries of the federally sponsored healthcare programs,

had to be done in compliance with its contractual obligations, including compliance with the federal Anti-Kickback Statute and the Beneficiary Inducement Statute.

19.    Compliance with the federal Anti-Kickback Statute and the Beneficiary Inducement Statute is a prerequisite to payment of federal funds. A violation of the federal Anti-Kickback Statute and/or the Beneficiary Inducement statutes vitiates a provider's right to receive or retain federal funds arising from the related claim. A claim for payment submitted by a provider that has violated the federal Anti-Kickback Statute or the Beneficiary Inducement Statute is a false claim for payment in violation of the False Claims Acts.

## FACTS

20.    Relator Ryan Mesaros is a licensed pharmacist. He is licensed to practice pharmacy in the state of Minnesota. Relator has been living and working in Minnesota as a pharmacist since 2012.

21.    From November 17, 2014 through May 5, 2015, Relator worked for Defendant as a retail pharmacist. During the period ending December 2015, Defendant operated approximately 75 pharmacies in Minnesota and 38 pharmacies in Massachusetts.

22.    During his tenure at Defendant, Relator worked at approximately 17 of Defendant's pharmacies in the state of Minnesota, including without limitation the following locations: Andover, Blaine, Brooklyn Park, Cambridge, Champlin, Coon Rapids, Forest Lake, Fridley, Maple Grove North, Minneapolis Dinkytown, Minneapolis Northeast, Monticello, North St. Paul, Northtown, Shoreview, St. Cloud East and Stillwater.

23.    Commencing on or about December 2014, Relator personally witnessed Defendant engaging in violations of state and federal law, including without limitation, the federal Anti-Kickback Statute and Beneficiary Inducement Statute involving Medicare,

Medicaid, TRICARE and other federally funded healthcare programs in each and every one of the locations where he was assigned to work as a pharmacist. Defendant's unlawful practices resulted in, without limitation, false claims to the federal and state governments, over utilization of pharmaceuticals paid for by the United States, and the sale of brand name drugs while misrepresenting the beneficiary's true out-of-pocket (TrOOP) spending through the use of drug coupons.

24.     Because Defendant's pharmacy computer system provided its pharmacists with corporate-wide access to pharmacy records, Relator had the ability to view pharmacy transactions in Defendant's stores across the United States, including those in Massachusetts. This computer system permitted Relator to personally view Defendant's violations of state and federal law, including without limitation, the federal Anti-Kickback Statute and Beneficiary Inducement Statute at Massachusetts pharmacies related to the sale of drugs to federal healthcare beneficiaries.

25.     Relator has personal knowledge that at various times during the course of the seven-plus years before Defendant sold its pharmacy business to CVS, Defendant paid unlawful remuneration to numerous eligible beneficiaries of federally sponsored healthcare plans and programs in violation of the federal Anti-Kickback Statute and the Beneficiary Inducement Statute to induce such persons to purchase, order, or arrange to order or otherwise influence such persons to order prescription drugs and other medical supplies from Defendant's pharmacies, for which payment would be made in whole or in part under a federal healthcare program.

26.     Defendant recruited and enrolled such eligible beneficiaries in the Rx Rewards program for benefits that were more than nominal in order to induce such beneficiaries to transfer their patronage and to purchase prescription drugs and other medical supplies from

Defendants. Defendant knew that such inducements offered to beneficiaries of publically funded programs were unlawful and expressly acknowledged the unlawfulness of such inducements in the fine print of written materials advertising its Rx Rewards program.

## ANTI-KICKBACK STATUTE VIOLATIONS IN MINNESOTA AND MASSACHUSETTS RELATED TO BENEFICIARY INDUCEMENT BY DEFENDANT'S PHARMACY RxREWARDS PROGRAM

27.    Beginning in approximately 2008, Defendant initiated the Target Pharmacy Rx Rewards program ("Rewards") throughout its retail pharmacy system. The Rewards program was implemented in Minnesota and Massachusetts, as well as all other states in which Defendant had pharmacies. This program continued to operate until December 2015, when Defendant sold its pharmacy operations to CVS Pharmacies.

28.    The Rewards program worked in the following manner: Defendant's pharmacy employees, as well as front of the store (non-pharmacy employees), pushed Defendant's customers to enroll in Rewards. Upon enrollment, the customers got a Rewards identification number that was then tracked in the computer system, both in the pharmacy and in retail sales.

29.    New members in Defendant's Rewards program received an immediate in-store 5% off discount coupon and an additional online 5% off discount with their first filled prescription from a Defendant pharmacy. Thereafter, the enrolled customer received additional coupons for each five prescriptions he/she filled with no caps or limits on the number he/she could receive in a calendar year.

30.    These Rewards coupons could be used for purchases in Defendant's stores or online, and they could be used for one entire day, for as many purchases as possible, in multiple stores or online, in any combination.

31.     Thus, the coupons were multi-use certificates with no monetary limits on customer spending nor limits on the discounts received by the federal healthcare beneficiary customer.

32.     Defendant used intensive consumer advertising to push the Rewards program. The purpose was to drive customers to Defendant's pharmacies, and to increase pharmaceutical sales and utilization. For example, Defendant ran promotions for entire months during which customers received Rewards "double points" for each prescription filled or refilled.

33.     Defendant's internal Rewards program policy and instruction manual shows the company was fully aware that the program should not have been available to beneficiaries of federally funded healthcare programs, including Medicaid, and that prescriptions filled under those insurance plans were not eligible to participate in the Rewards discount coupon program.

34.     Defendant used the Rewards program enrollment of customers, which it called customer "conversion," as a significant performance metric for both its pharmacies and employees, including pharmacists and pharmacy techs.

35.     Defendant pushed the Rewards program through in-person conversion at the pharmacy counter, in-person conversion by the front-of-the-store (non-pharmacy) cashiers, print advertising, online advertising and distribution of coupons and flyers.

36.     By way of example only, internal documents show Defendant enrolled over 260,000 new customers in the Rewards program in April 2014, which was projected to drive $1M in additional pharmacy sales for that spring season. This same document sets out that even non-pharmacy employees in front-of-the-store positions were expected to recruit and enroll customers into Rewards, in addition to the pharmacies' staff.  These non-pharmacy employees

had no pharmacy-related training, nor expertise in who was ineligible for Rewards based on participation in federal healthcare programs.

37.     Defendant's internal documents also show that Defendant was aiming its marketing to Rewards customers who were going to use the discount coupons for large purchases, such as through baby and wedding registries.

38.     Relator's job performance was measured by how many customers he enrolled in the Rewards program; the same metric applied to all of Defendant's pharmacists and pharmacy techs. Relator's and other pharmacists' year-end bonus calculations were based, in part, on their successful enrollments of customers in Rewards.

39.     Relator personally witnessed the Rewards enrollment of hundreds of customers who were enrollees in federal healthcare insurance programs. He knew this to be prohibited under the law, as set forth in Defendant's own policies and documents and through his own research.  As a result, he refused to push the program with the expected aggressiveness and received negative performance metrics warnings from his supervisors as a result.

40.     During his employment by Defendant, Relator increasingly witnessed the company's actions in regard to the Rewards program to be the single-minded implementation of enrollment of everyone, regardless of whether they were ineligible due to federal health insurance beneficiary status.

41.     A system-wide email from Defendant's Pharmacy headquarters, dated December 18, 2014, states, "As you all know, RxRewards guests use our pharmacies more and spend more in our stores, so let's get them enrolled."

42.     As personally observed by Relator, Defendant's push to enroll all of its customers was evidenced by Defendant's Pharmacy Update email, dated February 2, 2015. In addressing

the Rewards program, Defendant wrote, "RxRewards guests spend more money than non-rewards guests in our stores = Profitable Sales! ... Keep the plan simple: *ASK every guest* and we should easily be able to be 9/9>25%! Let's start 2015 out right!"

43.    At this time, Relator personally observed that at some stores where he was assigned, the overwhelming majority of pharmacy customers were beneficiaries of government healthcare plans.

44.    In early 2015, Relator became increasingly concerned that Defendant was violating anti-kickback laws related to these practices. He reviewed Defendant's Healthcare Compliance Policy, No. 100-70-10, which states in part,

> "Anti-kickback Laws....These laws prohibit Defendant from offering incentives to use Defendant Pharmacy or Defendant Clinic to guests whose prescriptions or healthcare services are paid for in whole or in part by a government programs [sic]. That is why we cannot allow these guests to enroll in our Pharmacy Rewards program, include them in coupon offers...."

45.    Relator knew that the value of Defendant's Rewards discount cards and coupons had the clear potential to exceed the $10/$50 de minimis safe harbor of the Anti-Kickback Statute. He personally observed Defendant push the Rewards program to customers for multiple purchases in one day, and specifically marketed the program for large purchases, such as new televisions for the Super Bowl and wedding and baby registry gifts.

46.    Relator also discovered through his own research that Defendant's customers were actively engaging in the sale of Defendant's Rewards coupons on eBay, with asking prices ranging from $38 to $199.99 per coupon. He discovered completed eBay sales ("sold listings") of Rewards cards ranging in sale price from $69.99 to $99.00.

47.    Rewards coupons had monetary value in a resale market in excess of $10 each, and Defendant's pharmacy customers enrolled in the program were able to get a new coupon

after, at most, every five prescriptions were filled. Additional coupons were also provided at various times through scheduled promotions.

48.    Defendant placed no caps or limitations on the program for the "remuneration" going back to the customers in the form of total numbers of discount coupons and total monetary value of discounts that could be received annually. This lack of caps and limits was an attractive inducement for federal healthcare beneficiaries to use Defendant's pharmacies.

49.    Further, the Rewards program was set up so that these Rewards could only be earned by filling prescriptions. The more prescriptions filled, the more Rewards earned, and the more utilization of pharmaceuticals occurred.

50.    Relator personally searched Defendant's internal records regarding his concerns that Defendant was actively and impermissibly enrolling federally funded healthcare beneficiaries in the Rewards program. He found that Defendant's pharmacy employees had published official internal documents on Defendant's SharePoint server, such as the one on January 11, 2014, which showed that "25% of Rx Rewards punches accumulated were funded by a federally funded insurance plan."

51.    On April 20, 2015, Relator conducted a phone call with his pharmacy supervisor, during which he raised concerns that Defendant was violating anti-kickback laws.    The supervisor's response was the following:

> "Drug interactions, that is your professional judgment. I don't want you to worry about the company's liability for an Rx Rewards enrollment because that is not something that we need pharmacists to be exerting their efforts and their professional judgment on. Let the legal department worry about that because they're the ones who are going to get in trouble if we're not following policy the right way on that. There are people that are paid at headquarters to follow up on that sort of thing. I just want you to worry about the safety and accuracy of your guests in the store if that makes sense."

52.    On April 21, 2015, Relator's superiors told him he was not enrolling enough customers in Rewards. He was told that he must enroll someone in the program by the end of the week. His supervisor's exact words were, "Enroll your dog if you have to."

53.    On May 5, 2015, Relator resigned his employment at Defendant due to his ongoing concerns about Defendant engaging in healthcare fraud, false claims submissions to the federal and state governments, and violations of the Anti-Kickback Statutes.

## EXAMPLES OF FEDERAL HEALTHCARE BENEFICIARIES ENROLLED BY DEFENDANT IN ITS REWARDS PROGRAM

54.    Prior to resigning his employment with Defendant, Relator gathered documentation of multiple examples of Defendant's violations of the Anti-Kickback Statutes and False Claims Acts related to the Rewards program.

55.    Relator's work as a pharmacist in seventeen of Defendant's pharmacies brought him into contact with thousands of pharmacy customers in 2014 and 2015.  From the beginning of his tenure with Defendant, he noticed every week that many of the patients were covered by federal healthcare plans, yet they were nonetheless enrolled in the Rewards program and actively used it. In Minnesota, he personally witnessed the following federal healthcare beneficiaries enrolled and enjoying the benefits of Defendant's Rewards program:

a.    Customer P.R.: Medicare patient from Minnesota. RxRewards #98901371322133.

b.    Customer V.T.: Medicare Part B and Medicare Part D patient from Minnesota. RxRewards #98901396333299.

c.    Customer G.T.: Medicare patient from Minnesota.  RxRewards #98901396333299.  (This patient had many medications and refills; thus received many 5% discount coupons.)

d.    Customer P.L.: Federal healthcare beneficiary from Minnesota.  RxRewards #98901327383812.

e.    Customer L.C.: Medicare Part D beneficiary from Minnesota. RxRewards #98901372346251.

f.    Customer C.A.: Medicare patient from Minnesota. RxRewards #98901371322133. In March 2015, she told Relator that she would wait to refill her prescriptions in order to get "Double Rewards" in an April 2015 Defendant promotion.

56.    Suspicious that Defendant's unlawful practices were widespread, Relator used Defendant's pharmacy computer system to view customer enrollment in the Rewards program in the Commonwealth of Massachusetts. He found multiple examples of Medicare, Medicaid and other federal healthcare plan beneficiaries enrolled in the Rewards program in Massachusetts. An example from Massachusetts is as follows:

a.    Customer A.R.: Massachusetts Medicaid patient. RxRewards #98901435773734.

57.    The actions of Defendant described above have resulted in the knowing submission of false claims to the United States Government and the Plaintiff States through violations of the Anti-Kickback statutes, the Beneficiary Inducement Statute and the False Claims Acts.


**ANTI-KICKBACK STATUTE VIOLATIONS IN MINNESOTA RELATED TO DEFENDANT'S PROVISION OF DRUG COUPONS TO FEDERAL HEALTHCARE PROGRAM BENEFICIARIES IN ORDER TO REDUCE COPAYMENTS**

58.    Upon commencing his employment with Defendant in November 2014, Relator became aware that Defendant was improperly accepting and providing drug manufacturer copayment coupons to beneficiaries of federally funded healthcare programs to reduce or eliminate the cost of the customers' copayments for brand name drugs.

59.    Under federal and Minnesota law, pharmacies must review drug coupons and then refuse to accept it if the customer is a federal healthcare program beneficiary.

60.    Defendant knowingly and improperly influenced the decisions of federal healthcare program beneficiaries to bring their prescriptions to and be refilled by Defendant through the offer and use of drug manufacturer coupons.

61.    Defendant's offer and use of the drug coupons also caused federal healthcare program beneficiaries to seek and acquire expensive, brand name drugs in lieu of cheaper generic drugs. This has caused the federal government increased healthcare program costs without providing any medical benefits to the customers.

62.    Medicare Part D and other federal healthcare programs prohibit enticing consumers to purchase medicines by using drug manufacturer coupons used to reduce or eliminate copayments. For example, coupon use increases costs to federal programs because it encourages consumers to purchase brand name drugs that are more expensive than generics. Pharmaceutical companies engage in this practice to sustain brand name drug market share. Pharmacies such as Defendant engage in these practices to entice federal beneficiaries to come to Defendant pharmacies. The end result is increased costs to the federal government.

63.    Such practices are considered a kickback scheme, and the entire transaction stream is impugned, including the reimbursement to the pharmacy by the federal healthcare plan involved.

64.    Such conduct by pharmacies violates federal laws (and Minnesota law) when they accept remuneration for the purchase of the drugs for which a federally funded healthcare program may make a payment. This also constitutes remuneration to the patient by reducing or eliminating the copayment cost to encourage purchase of the brand name drug and increases patronage of the pharmacy.

65.     While employed by Defendant, Relator personally witnessed many instances of beneficiaries of federal healthcare insurance plans using coupons for brand name drugs, in order to reduce their copayments. In many instances, Relator watched as Defendant's pharmacists and/or technicians would themselves look up the coupons and then provide them to the prohibited customers.

66.     Defendant had a coupon compliance policy in place.   Nonetheless, Relator routinely witnessed this policy being breached by Defendant's pharmacies.

67.     As far back as August 2009, Defendant was aware that its retail pharmacy operations were allowing the use of drug coupons on Medicare covered prescriptions, without a mechanism to restrict the use of coupons on federally funded prescriptions.

68.     As Relator personally experienced, Defendant did not provide training on the use of drug coupons by customers. At each Defendant pharmacy he worked at, he witnessed the pharmacy personnel accept such drug coupons with no scrutiny, and the coupons were then applied to the copayments of the federal beneficiaries.  Oftentimes pharmacy personnel would go through substantial trouble applying these coupons.

69.     When Relator reported his concerns about anti-kickback violations to his supervisors, he was told that it was not an issue for him to worry about.

70.     At each location he worked, Relator witnessed Defendant's pharmacies posting lists of available drug company coupons behind the counter, in order to encourage and enable the pharmacists and technicians to push such coupons on the customers, including federal beneficiaries.  At each location he worked, Relator witnessed Defendant's pharmacy software generating drug copay coupons to be placed in the bag with patient information literature. These coupons were generated by the software and took into account specific and personalized patient

drug utilization history. This process of printing full page coupons along with drug information was meant to appear as if the pharmacist was offering it as a courtesy to the patient. The software did not use discretion when selecting government or commercially insured customers.

71.     Defendant measured pharmacy performance by customer "Vibe," and when pharmacies provided drug coupons to customers, these Vibe stories were kept track of internally as a performance measure. This included Vibe feedback from beneficiaries of federal healthcare programs.

72.     Relator personally witnessed many instances where the use of drug coupons resulted in government programs being charged for expensive brand name drugs, rather than an equally effective, preferred generic. This resulted in higher reimbursement costs to the federal healthcare program affected.

73.     Relator also became aware that another consequence and cost to the federal government of Defendant accepting and/or providing drug company coupons to federal healthcare beneficiaries was that this practice manipulated the "True Out-Of-Pocket Costs" (TrOOP) to CMS in regard to Medicare Part D patients. Under Medicare's prescription drug plan, a beneficiary's TrOOP are the portion of his or her expenses that count toward that person's annual Medicare drug plan threshold. For example, when a drug coupon is used by a federal beneficiary, CMS will think that the beneficiary paid, e.g., $500 out of pocket, when in reality the coupon reduced this amount to, e.g., $25. Thus, that beneficiary's TrOOP is fraudulently manipulated by the pharmacy accepting the use of such coupons. This practice enables the beneficiary to reach catastrophic prescription drug coverage before they are truly eligible, leading to greatly increased coverage that they would not normally be entitled to. Relator routinely witnessed this occur at Defendant's pharmacies.

74.    Relator presents the following examples of the false, fraudulent and illegal use of drug coupons by Defendant's Minnesota pharmacies during his employment, by way of example only and without limitation:

a.    Customer J.E.: Medicare Part D beneficiary. Three different drug coupons were applied to her various copayments: Pharm Data Mgmt Bin #610020, Opus Health Coupon and McKesson Drug Discount. The prescription for which these coupons were used is brand name drug Oracea, which has a cheaper generic alternative (doxycycline). Medicare Part D paid $347.68 for the brand name drug, and J.E. got her copay reduced by the coupon from $70 to $25. This customer had been taking this drug for many years, with voluminous refills at Defendant using Medicare along with supplemental drug coupons.

b.    Customer E.B.: Medicare Part D beneficiary. She used a drug coupon for brand name Nexium, from Therapy First-Secondary Claims, which reduced her copay from $200 to $54. Medicare Part D then paid $447.88 for this brand name prescription on July 9, 2013.

c.    Customer F.N.:  Medicare Part D beneficiary. She used a drug coupon for Combivent Respimat.  She used this coupon for the brand name drug rather than a cheaper generic, and paid a $40 copay for this prescription on February 18, 2015. Medicare Part D paid the brand name reimbursement value of $318.49.

d.    Customer J.S.: Medicare Part B and D beneficiary. He used drug coupons Medco Health Bin #610014, Pharm Data Mgmt Bin #610020 to reduce his copay for brand name Xifaxan from $513.47 to $13.47. Relator personally knew J.S. to be a repeated drug coupon user at Defendant. He witnessed this occur monthly between September 2014 and February 2015 at Defendant's Stillwater, Minnesota pharmacy.

75.    Relator personally reviewed Defendant's pharmacy expense reports for customers J.E. and J.S. (see above) which show multiple Medicare Part D prescriptions (MRX) paid for in part with drug company coupons.  In these reports, the acronyms "OHI" and "PDM signify drug coupons for brand name pharmaceuticals that were used in these pharmacy transactions with federally funded Medicare Part D healthcare plans.

76.    Upon information and belief, Relator believes that there are many thousands of transactions involving Defendant's Minnesota pharmacies accepting and/or providing drug

company coupons in conjunction with prescriptions sold to beneficiaries of federally funded healthcare plans.

77.    The conduct set forth above violated the Anti-kickback Statute, the Beneficiary Inducement Statute and the federal and Minnesota False Claims Acts, resulting in fraudulent and false claims to the United States of America and the State of Minnesota.

78.    As a direct and proximate result of Defendant's unlawful conduct, the United States Government and the Plaintiff States have been damaged.

## COUNT ONE
## UNITED STATES FALSE CLAIMS ACT AND ANTI-KICKBACK STATUTE VIOLATIONS
## 31 U.S.C. § 3729(a)(1) and (a)(2); 42 U.S.C. §1320a-7b(b); and 42 U.S.C. §1320a-7a(a)(5)

79.    Relator re-alleges the foregoing paragraphs as though fully set forth herein.

80.    Defendant, by and through its officers, agents, supervisors, directors and employees, knowingly presented or caused to be presented to the United States Government and the Plaintiff States false claims for payment of services and medications under federal healthcare insurance programs in violation of 31 U.S.C. § 3729(a)(1), 42 U.S.C. §1320a-7b(b), and 42 U.S.C. §1320a-7a(a)(5).

81.    Defendant, by and through its officers, agents, supervisors, directors and employees, knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the United States Government and the Plaintiff States, for payment of services and medications under Medicaid, in violation of 31 U.S.C. § 3729(a)(2), 42 U.S.C. §1320a-7b(b), and 42 U.S.C. §1320a-7a(a)(5).

82.    Defendant, by and through its officers, agents, supervisors, directors and employees, authorized the various officers, agents, supervisors, directors and employees of Defendant to take the unlawful actions set forth above and below.

83.    Defendant knowingly hid and otherwise failed to disclose to the United States, the HHS, the Plaintiff States and other Federal and State agencies that Defendant had been submitting false claims for payment of services and medications under federal healthcare insurance programs.

84.    Defendant falsely represented to the United States Government and the Plaintiff States that the billings Defendant submitted for payment of services and medications under federal healthcare insurance programs (and state Medicaid) were proper and did not violate the Anti-Kickback Statute and the Beneficiary Inducement Statute. This resulted in the submission of false claims to the United States Government and the Plaintiff States and the payment to Defendant for said false claims by the United States Government and the Plaintiff States.

85.    Defendant's course of conduct violated the United States False Claims Act, 31 U.S.C. §§ 3729 et seq., the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), and the Beneficiary Inducement Statute, 42 U.S.C. §1320a-7a(a)(5).

86.    As a result of Defendant's knowing payment of such unlawful remunerations to the beneficiaries and enrollees of federally funded healthcare programs, to induce and reward said beneficiaries and enrollees to purchase prescription drugs from Defendant, wherein such programs paid for such prescription drugs in whole or in part, Defendant has knowingly caused false claims to be submitted to the federally funded healthcare programs resulting in reimbursement to Defendant of millions of dollars from the federally funded healthcare programs in violation of the Federal False Claims Act, 31 U.S.C. §3726 et seq., the Federal Anti-Kickback

Statute, 42 U.S.C. §1320a-7b(b), the Beneficiary Inducements Statute, 42 U.S.C. §1320a-7a(a)(5) and the State False Claims Acts. Because of these acts, the United States and the Plaintiff states have suffered monetary damages in an amount in excess of $75,000.

## COUNT TWO
## MINNESOTA FALSE CLAIMS ACT VIOLATIONS

87.    Relator re-alleges the foregoing paragraphs as though fully set forth herein.

88.    By virtue of the above-described acts, among others, Defendant has knowingly submitted, directly or indirectly, to officers, employees or agents of the State of Minnesota, false Medicaid claims for payment or approval for prescription drugs and services in violation of the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 et seq. Because of these acts, the State of Minnesota has suffered monetary damages in an amount in excess of $75,000.

## COUNT THREE
## MASSACHUSETTS FALSE CLAIMS ACT VIOLATIONS

89.    Relator re-alleges the foregoing paragraphs as though fully set forth herein.

90.    By virtue of the above-described acts, among others, Defendant has knowingly submitted, directly or indirectly, to officers, employees or agents of the State of Massachusetts, false Medicaid claims for payment or approval for prescription drugs and services in violation of the Massachusetts False Claims Act, Mass. Gen. Laws, Ch. 12, §5(A) et seq. Because of these acts, the Commonwealth of Massachusetts has suffered monetary damages in an amount in excess of $75,000.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator, on behalf of himself and the United States Government and the Plaintiff States, respectfully prays:

A.      That this Court enter judgment against the above-named Defendant in an amount equal to three times the amount of damages the United States Government and the Plaintiff States have sustained because of Defendant's actions;

B.      That this Court impose on Defendant a civil penalty of $5,500 to $11,000 for each action in violation of 31 U.S.C. §§ 3729 et seq., the Minnesota False Claims Act and the Massachusetts False Claims Act; plus three times the amount of damages each governmental plaintiff sustained; and award damages to the Plaintiffs under the Anti-Kickback Statute and the Beneficiary Inducement Statute;

C.      That this Court order Defendant to pay the costs of this litigation, with interest, incurred by both the Relator, the United States Government, and the Plaintiff States;

D.      That the Relator shall be awarded all costs incurred, including reasonable attorneys' fees;

E.      That, in the event the United States Government and/or the Plaintiff States continue to proceed with this action, the Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action or settlement of the claim;

F.      That, in the event the United States Government and/or the Plaintiff States do not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of the action or settlement of the claim;

G.      That the United States Government, the Plaintiff States and the Relator be awarded prejudgment interest; and

H.      That the United States Government, the Plaintiff States and the Relator receive all relief, both in law and in equity, to which they may reasonably appear entitled.

## JURY DEMAND

Relator, on behalf of himself, the United States Government and the Plaintiff States, hereby demands a trial by jury of all issues triable of right by a jury.

Date:  February 22, 2017

**JOHN A. KLASSEN, PA**

John A. Klassen (No. 24434X)
310 Fourth Avenue South
Suite 5010
Minneapolis, MN 55415
(612) 204-4533
john@jaklaw.com

**MULLER & MULLER, PLLC**
Andrew P. Muller (No. 32467X)
3109 West 50th Street, No. 362
Minneapolis, MN 55410-2102
(612) 604-5341
apmuller@themullerlawfirm.com

**ATTORNEYS FOR PLAINTIFF AND RELATOR RYAN MESAROS**